## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **TECH LOUNGE SP, LLC and THE LAW OFFICE OF KEVIN ADAMS, PLLC, on behalf of themselves and all others similarly situated,**<br><br><div align="center">**Plaintiffs,**</div><br><div align="center">**v.**</div><br>**CARDCONNECT CORP.,**<br><br><div align="center">**Defendant.**</div> | Civil Action No. _____<br><br><div align="center">**COMPLAINT – CLASS ACTION**</div><br><div align="center">**JURY TRIAL DEMANDED**</div> |

<u>**COMPLAINT – CLASS ACTION**</u>

Plaintiffs Tech Lounge SP, LLC and The Law Office of Kevin Adams, PLLC, on behalf of themselves and the class of persons and entities preliminarily defined below, file this Class Action Complaint against Defendant CardConnect Corp. ("CardConnect" or "Defendant"). This case is directly related to another class action pending in this Court – *Kao, et al. v. CardConnect Corp.*, Civil Action No. 2:16-cv-05707-WD (E.D. Pa.) – and will be designated a related case on the civil cover sheet. In the *Kao* case, CardConnect has staked its position that it could only ever be liable for categories of improper fees actually paid by a named class representative – as opposed to liability for all unauthorized fees generally – thus necessitating this suit. If Defendant's position in *Kao* is eventually deemed correct, then customers would arguably have lost their right to pursue reimbursement for millions of dollars of improper fees. Although a new suit for the additional fee categories could be filed at that time, claims for fees assessed prior to the statute of limitations cut-off might be foreclosed. As such, this action needed to be promptly filed.

## NATURE OF THE CASE

1.      This is a civil action seeking monetary damages, restitution, and declaratory relief from Defendant arising from its improper business practices in connection with the provision of merchant services relating to payments via credit and debit cards ("merchant services" or "payment processing services").

2.      In today's business world, the vast majority of merchants must accept payment for goods and services via credit and debit cards to stay competitive in the marketplace.  In order to accept this method of payment, the merchant must utilize merchant services.

3.      Merchants rely on the companies that provide merchant services to do so at a fair price and in accordance with fair and appropriate terms.  Fees for merchant services are likely the third highest expense most merchants incur, following labor and product costs.

4.      Merchant services are provided through a system involving many parties.  For instance, in addition to the merchant that receives payment and the customer who provides such payment, the processing of a card transaction is likely to involve (a) the bank that issued the credit or debit card to the customer (e.g., Chase or Bank of America); (b) the card association through which the transaction is processed (e.g., Visa, MasterCard, Discover, or American Express); (c) the card association member bank (e.g., Wells Fargo, Synovus); (d) the company that actually processes the payment (e.g., First Data); (e) the company that sells or leases the payment processing equipment to the merchant (although the merchant is certainly allowed to own this equipment); (f) the merchant acquirer that provides merchant services (e.g., ensures payments are processed, handles monthly billing, and maintains the relationship with the merchant); and (g) the Independent Sales Organization ("ISO") that enrolls merchants in the merchant acquirer's

services.  CardConnect is a merchant acquirer and is also an ISO.  Additionally, CardConnect deals with over 1,100 third party sales agents to enroll merchants in its services.

5.      The number of involved parties and moving pieces make it very difficult for small merchants to understand the process and/or how much it will cost.

6.      Front-end explanation and clarity by ISOs is critical because merchants typically sign long-term deals for merchant services that are either non-cancellable or cancellable only with hefty early termination penalties.  For example, CardConnect has implemented contracts with terms of up to five years and with early termination fees of $750 or more.

7.      Unfortunately, some ISOs and payment processors take advantage of their position. They induce "mom and pop" merchants to purchase merchant services without disclosing fees they know the merchant will be charged.  They also set up contractual relationships that bind the merchant but not themselves and bury unconscionable and self-serving provisions in the middle of their fine print form contracts that allow them to charge whatever they want, whenever they want for merchant services.

8.      ISOs engage in such tactics because they receive profits every month as long as they can keep merchant customers from leaving to competitors.

9.      As an ISO, CardConnect is on the front line as the direct contact with merchants and the intermediary between merchants and the payment processor and member bank. CardConnect deals with First Data as its payment processor and Wells Fargo Bank, N.A. as its primary member bank.

10.     This case challenges CardConnect's business practices.  Specifically, CardConnect induces merchants to enter business relationships with it and its member bank by promising it will charge merchants low, agreed-upon rates and fees for payment processing services.  CardConnect

then has merchants and a principal guarantor sign long-term written contracts with boilerplate, non-negotiable terms and conditions.

11.    The fine print terms that CardConnect intends to largely govern the contractual relationship are set forth in a separate document.  In this way merchants see and execute one document that prominently displays the agreed-upon rates and fees (the "Merchant Processing Application"), but are purportedly also bound by another document (the "Program Guide"). Through the separate, fine print Program Guide, CardConnect seeks to backtrack from the agreed-upon fees and rates that have actually been reviewed and approved by the merchants and immunize itself from liability if the merchant learns of CardConnect's overcharges.  Such provisions are illusory, lack mutuality, violate public policy, and are unconscionable.

12.    More fundamentally, however, neither CardConnect nor the member bank ever actually "accept" the contracts by signing them – an express condition precedent to their formation. What results is a state of contractual limbo that gives CardConnect the discretion to disregard agreed-upon rates and charges that it never formally "accepted," while at the same time purporting to hold merchants to fine print terms that are unfavorable to them.

13.    After merchants and their principal guarantors sign the contracts and the parties begin to do business, CardConnect raises rates and imposes new, unanticipated payment processing fees.  CardConnect is able to do so because it never "accepted" the contracts and is thus not limited to the fees and charges denoted therein.  These practices, of course, constitute unjust enrichment and it would be improper for CardConnect to retain such excessive, uncontemplated fees and charges.

14.    Alternatively, if CardConnect and the member bank could be deemed to have "accepted" the contract (such that it had been formed), the excessive fees and charges imposed

violate such contracts. Such fees are also violative of the covenant of good faith and fair dealing, which applies to such contracts under Pennsylvania law (which is made applicable by a term of CardConnect's form contract).

15.     Any argument by CardConnect that the excessive fees and charges are authorized by self-serving, adhesive contractual provisions referenced in paragraph 11, *supra*, are without merit because such terms are unenforceable.

## PARTIES

16.     Plaintiff Tech Lounge SP, LLC ("Tech Lounge") is a Wisconsin limited liability company with its principal place of business at 1036 Main Street in Stevens Point, Wisconsin. Tech Lounge operates a video gaming lounge.

17.     Plaintiff The Law Office of Kevin Adams, PLLC ("Adams") is a Michigan professional service limited liability company with its principal place of business at 31324 Schoolcraft Road in Livonia, Michigan. Adams operates a law office.

18.     Defendant CardConnect Corp. is the new name of FinTech Acquisition, Corp. ("FinTech"). FinTech was formed in 2013 and went public in 2015, raising $100 million to make acquisitions. It was required to close on such an acquisition by August of 2016, or the company was to be dissolved. On March 7, 2016, FinTech announced that it would acquire FTS Holding Corporation, the parent corporation for CardConnect LLC. The price was about $350,000,000 in cash and stock. The deal closed on August 1, 2016. The combined companies are now included in CardConnect Corp., which is publicly traded on the NASDAQ Stock Market with ticker symbol "CCN."

19.     In May of 2017, it was announced that First Data Corporation would acquire all outstanding CardConnect shares at a price of $15.00/share. The aggregate transaction amount is

approximately $750,000,000, including repayment of CardConnect's outstanding debt and the redemption of CardConnect's preferred stock. At the time of the First Data deal, CardConnect was processing approximately $26 billion of volume annually from about 67,000 merchant customers. If this transaction is consummated, and depending on the corporate structure utilized by First Data after closing, it may become appropriate to add or substitute First Data or another of its affiliates as a real party in interest.

## JURISDICTION AND VENUE

20.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d)(2) because there are more than 100 potential class members and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest, fees, and costs, and some class members, including Plaintiffs, are citizens of states other than Pennsylvania.

21.    This Court has personal jurisdiction over Defendant because it conducts substantial business within the district. Indeed, CardConnect's headquarters are located in King of Prussia, Pennsylvania. As such, it has significant, continuous, and pervasive contacts in this district.

22.    Venue lies within this judicial district under 28 U.S.C. § 1391 because Defendant has its headquarters here and conducts substantial business in this district, and a substantial portion of the events, omissions, and acts giving rise to the claims herein occurred in this district.

23.    If CardConnect's form contract is deemed to be enforceable, venue and jurisdiction would also be proper pursuant to the contract's forum selection clause, which states:

> **Venue.** We have substantial facilities in the State of Pennsylvania and many of the services provided under this Agreement are provided from these facilities. The exclusive venue for any actions or claims arising under or related to this Agreement shall be in the appropriate state or federal court located in Pennsylvania.

## COMMON FACTUAL ALLEGATIONS

A.    CardConnect Induces Merchants to Do Business with Promises of Low Cost Pricing.

24.    CardConnect works with over 1,100 independent sales agents who sell CardConnect's services.  These agents are not CardConnect employees.  CardConnect also uses in-house sales people which are its employees.

25.    Even sales people that are not CardConnect employees, however, are allowed to use a CardConnect email address, switchboard for phone calls, fax number, etc.  These authorized agents are even encouraged to give themselves a title, such as "Sales Manager, CardConnect," even though they are not employed by the company.  They are allowed to pick their own titles, without regard for their actual position – sales agent – for CardConnect.  Once again, they also use CardConnect paperwork and contracts.  In all respects, customers are given the false impression that the sales agents are the officers or employees of a large publicly-traded corporation.

26.    CardConnect pays these sales agents substantial commissions on the revenue CardConnect receives from merchant customers the agents enroll.

27.    CardConnect agents contact prospective merchant customers and promise they can save them money on merchant services if they switch to CardConnect.

28.    The agents and merchants then negotiate the fees the merchant would pay for merchant services.  These fees are prominently described in a "Service Fee Schedule" in CardConnect's form "Merchant Processing Application" (hereinafter, "Application").

B.    A Contractual Relationship Is Contingent Upon CardConnect and Wells Fargo First Signing the Agreement.

29.    If a merchant is satisfied with the agreed-upon fees, the CardConnect agent has the merchant sign the Application, which includes contractual language which purports to bind the

merchant.  For example, it states "Client agrees to all the terms of this Merchant Processing Application and Agreement."

30.    The Application also purports to integrate a much larger document, the CardConnect Program Guide.  Since it includes dozens of pages of small print legalese, it is understood that no merchant could ever read or understand the Program Guide.

31.    The Application also requires that an individual person sign and "unconditionally and irrevocably guarantee the full payment and performance of" the merchant.

32.    The Application states in bolded print immediately above the merchant's signature line that "**[t]his Merchant Processing Application and Agreement shall not take effect until Client has been approved and this Agreement has been accepted by CardConnect and Bank**."  Bank is later defined to mean Wells Fargo Bank, N.A.  CardConnect may substitute Synovus Bank (USA) as "Bank" in some versions of the contract, since the CardConnect website states that the company is also an ISO for Synovus.

33.    The Application then includes a section to be completed by CardConnect and Wells Fargo (or other Bank if applicable).  For CardConnect it states: "Accepted By Financial Transaction Services, LLC dba CardConnect" and includes a signature line, blank to fill in the signer's title with the company, and a blank for the date.    For "Bank" it states: "Accepted By Wells Fargo Bank, N.A., 1200 Montego Way, Walnut Creek, CA 94598" and includes a signature line, blank to fill in the signer's title with Wells Fargo, and a blank for the date.

34.    In multiple additional sections of CardConnect's form contract documents, which were drafted and approved by CardConnect and Wells Fargo (and likely by Synovus Bank), it is made clear that both of these entities must accept and sign as a condition precedent to a legally binding contract.

35.     For example, the Program Guide's "Confirmation Page" has a section denoting "Important Member Bank Responsibilities," which includes a requirement that:  "The Bank *must be* a principal (*signer*) to the Agreement." (emphasis added).

36.     The Program Guide also incorporates the applicable rules of the card associations. *E.g.,* Program Guide, Preface (providing that all parties are bound by the "Card Organization Rules").  These rules require member banks to sign the Agreement.  *E.g.*, MasterCard Rules, § 7.6.1 (stating that all merchant agreements *must* be "signed by the Customer," with "Customer" defined to include the member bank).  Further, MasterCard requires the contract to state: "The Merchant Agreement *is not effective* and may not be modified in any respect *without the express written agreement of the Customer*."  *Id.* at § 7.6.1(1)(b) (emphasis added).   MasterCard specifically *prohibits* that the contract "take effect or imply that it takes effect prior to being *signed by the Customer*."  *Id.* at § 7.6.1(3) (emphasis added).  Pursuant to MasterCard Rule 5.1, CardConnect and Wells Fargo could be subject to an "assessment up to USD 2,500 per day" for *each day* they are not in compliance as to *each merchant*.

37.     This signature requirement is mutually beneficial.  It provides assurances to merchants that they can enforce the proposed contract.  After all, merchant discussions about the terms are with low-level representatives who are independent contractors and certainly are not authorized to sign for CardConnect or Wells Fargo.  Thus, having a signed agreement was necessary to allow merchants to protect themselves if CardConnect or Wells Fargo breached it. The signature requirement also allowed CardConnect and Wells Fargo final say over whether they were bound by the decision of CardConnect agents to contract with merchants.  Obviously, if the agent agreed to terms that either CardConnect or Wells Fargo believed were not acceptable, either company could withhold signature.  Moreover, without the signature requirement, CardConnect

and Wells Fargo would be subject to enormous assessments by the card associations for violating their clear rules.

38.     Despite these clear requirements in their own form contract documents, however, neither CardConnect nor Wells Fargo actually sign the Application.  As such, they have adopted a contracting system whereby they can always argue that merchants are bound by the terms of their contract, but they are never bound, because no authorized officer of CardConnect or Wells Fargo has ever signed the contract.  Indeed, pursuant to the plain terms, the contract "shall not take effect until . . . accepted by CardConnect and Bank."

39.     Of course, merchants are not aware of this trick.  They believe they have a binding deal with CardConnect at the agreed-upon rates and fees prominently displayed in the Application. Indeed, merchants are attracted to CardConnect because the contract includes rates and fees that will allow them to save money by reducing the costs they will pay for payment processing services if they switch providers.  This approach is very appealing to merchants because payment processing is a substantial business expense for them.

C.     CardConnect Buries Absurd Provisions in the Fine Print of the Program Guide that Purport to Allow It to Charge Whatever It Wants Without Fear of Legal Action.

40.     The Application itself does not indicate that (a) the agreed-upon fees and rates will increase (nor would increases be expected since technology and competition has actually driven down costs for payment processing) or (b) new, un-disclosed fees and rates will be charged.  Such terms unquestionably are important to merchants and would impact their decision to do business with CardConnect.

41.     Instead of conspicuously setting forth such critical provisions in the Application, CardConnect buries them in the fine print, non-negotiable Program Guide.  Multiple versions of

the Program Guide have been in effect during the relevant period, but the material terms have been the same throughout.

42.     The Application states that the merchant and personal guarantor obligate themselves to the terms set out in the Program Guide.  Given the dense legalese of the Program Guide, which is spread over 44 pages of tiny text (depending on the version and format), there is zero chance of a merchant (or the personal guarantor) actually having read or understood it.

43.     The Program Guide is a boilerplate document that is not negotiable.  *See*, *e.g.*, Program Guide, Confirmation Page ("**NO ALTERATIONS OR STRIKE-OUTS TO THE PROGRAM TERMS AND CONDITIONS WILL BE ACCEPTED**") (emphasis in original).

44.     Several terms set forth in the Program Guide represent a unilateral effort by CardConnect to (a) covertly backtrack from the rates and fees prominently set forth in the Application and (b) immunize itself from liability for improper practices.

45.     For example, the Program Guide purports to allow CardConnect "to increase our fees or add new fees for Services for any reason at any time, by notifying you thirty (30) days' [sic] prior to the effective date of any such change or addition." *Id.* at § 19.5.  Boiled down to its core, this provision purports to give CardConnect unlimited discretion to charge whatever it wants for merchant services even if such fees and rates are vastly different and higher than those that are clearly set forth in the Application.

46.     By way of additional examples, the Program Guide purports to (a) limit the statute of limitations for obtaining reimbursement for overcharges to 60 days (*id.* at § 19.10), (b) limit the total amount of CardConnect's liability to twelve months of fees (*id.* at § 21.4), and (c) waive the merchants' right to a trial by jury (*id.* at § 34.3).

47.    CardConnect uses these provisions, as well as its hefty early termination fees, as tools to discourage aggrieved merchants from terminating their relationships with CardConnect or pursuing legal action for overcharges.

48.    If the CardConnect contract is binding – despite Defendant's and Wells Fargo's failure to complete a condition precedent, by signing the contract – then several of the provisions highlighted above and others violate public policy, lack mutuality, are unconscionable, and are otherwise void and unenforceable.  *E.g.*, Program Guide, §§ 19.4, 19.10, 21.4, 21.5, 22.3, 24.2, 34.3, 35.7.

49.    More likely, since a binding agreement was never consummated given CardConnect and Wells Fargo's willful scheme to never sign the contract, the Court should apply principles of quasi-contract, determine that CardConnect's imposition of unfair, uncontemplated fees has resulted in unjust enrichment, and order Defendant to reimburse its victims.

D.    <u>CardConnect Raises Fees and Rates and Imposes New Categories of Fees Not Reflected in the Contract.</u>

50.    After CardConnect starts providing merchant services, almost immediately it begins cramming merchants with fees and rates that are inconsistent with the agreed-upon charges that are prominently set forth in the Application.

51.    Indeed, it increases agreed-upon rates and fees and also adds new categories of fees that were not referenced in the Application so that a few months into the relationship the fees and charges being imposed bear virtually no resemblance to those which merchants actually accepted.

52.    CardConnect knows that if it disclosed these substantial fees in the Applications, merchants would be much less likely to leave their then-current processor to do business with CardConnect.  Instead, CardConnect crams merchants with these unanticipated fees after the

relationship has commenced and merchants are "locked in" to long term deals that are only terminable upon payment of hefty penalties.

53.     CardConnect also waits until after the merchant is enrolled to add new fees because it need not pay any percentage of the new fees to the sales agent that originally enrolled the merchant in CardConnect's services.  Thus, for example, rather than disclose an annual "EMV P2PE Fee" of $95.00 on the Application and pay as much as 80% of the amounts received from such fee to the sales agent (depending on the terms agreed upon with the sales agent), CardConnect waits until the merchant is already enrolled and then imposes the fee and keeps 100% of the fee for itself.

54.     CardConnect seizes these additional amounts from merchant bank accounts before merchants even know they are gone.  Indeed, by the time merchants receive statements notifying them of the prior month's payment processing charges, CardConnect has already taken such amounts from their bank accounts.

## INDIVIDUAL FACTUAL ALLEGATIONS

A.     <u>Plaintiffs and CardConnect Negotiate Fees for Merchant Services.</u>

55.     Plaintiffs are former payment processing customers of CardConnect.  Their relationships with Defendant began in similar ways.

56.     Plaintiffs dealt with authorized agents of CardConnect who informed them that they could save substantial payment processing costs if they switched to CardConnect.  Plaintiffs and the agents then proceeded to negotiate the fees Plaintiffs would pay for such services.

57.     The agents presented Plaintiffs with the form Applications which specifically identified the fees and rates they would be charged.

58.     The Applications explained that Plaintiffs would both be charged "pass-through interchange" pricing.  Under this method of pricing, the interchange rates and the assessments set by the card associations are passed through to the merchant *at cost* and the merchant is separately charged an additional amount representing the payment processing fee.

59.     The Applications reflect that Plaintiffs will pay the standard card association interchange rates and assessments plus additional fees equal to 0.5% of the transaction amount and $0.10 per transaction.

60.     The Applications also disclosed that Plaintiffs would be charged specified recurring fees, such as monthly statement fees, batch fees, and regulatory product fees.

61.     Plaintiffs were satisfied with the terms, rates, and fees explicitly and prominently denoted on the Application and decided to do business with CardConnect.

62.     Plaintiffs thereafter signed the Applications.  Contracts were never consummated, however, because neither CardConnect nor Wells Fargo (the member bank) ever accepted the contracts by signing them.  *See* ¶¶ 29-39, *supra.*

B.      CardConnect Imposes Excessive Fees on Plaintiffs.

63.     Even without binding written contracts, the parties began to do business.

64.     After the parties' relationship commenced, it soon became clear that the agreed upon pricing was not being followed.

65.     CardConnect inflated card association fees that were supposed to be passed through to Plaintiffs at cost.  By way of example, Tech Lounge was charged $1.99 in Visa credit card interchange fees and $5.52 in Visa debit card interchange fees in July of 2015, even though its true pass through interchange fees were only $1.97 and $5.49, respectively.  By way of further example,

Adams was charged $7.50 in December of 2016 for a MasterCard "LOCATION FEE," even though the true amount of this pass through charge is much less.

66.     CardConnect also charged Plaintiffs junk fees that are mentioned *nowhere* on the Applications.  By way of example only, Adams was charged a "DATA BREACH" fee of $8.95 in June of 2017.  By way of further example, Adams was charged an "EMV P2PE" fee of $95.00 in December of 2016.

67.     CardConnect also charged Plaintiffs fees for services that Plaintiffs did not request and indeed provided no discernable benefit.  By way of example only, Tech Lounge was charged a monthly fee of $11.95 for "MERCHANT CLUB."  Tech Lounge did not request this service and has never benefitted therefrom.   It is a wholly worthless service that has been added by CardConnect to Tech Lounge's bill for no other reason than to line its own pockets.

68.     These fees are merely illustrative of the many unauthorized fees assessed by CardConnect.  Although Plaintiffs never agreed to pay these fees, CardConnect direct-debited these fees from Plaintiffs' bank account.  As is Defendant's practice, such fees were taken before Plaintiffs received statements itemizing such charges.

69.     CardConnect will likely attempt to defend its imposition of these unauthorized fees by arguing that the Program Guide provided it with the discretion to impose new fee categories.  However, even assuming the Program Guide is a binding, enforceable contract (which Plaintiffs dispute), CardConnect's ability to impose new fee categories is contingent upon CardConnect providing 30 days notice "prior to the effective date of any such change or addition."  *See* Program Guide, § 19.5.

70.     However, CardConnect failed to provide timely or substantively sufficient notices. CardConnect's implementation of new fees without providing timely, proper notice is a direct breach of the Program Guide.

71.     CardConnect's actions are also not authorized by Section 19.4 of the Program Guide, which purports to allow new fees to be modified in response to pricing increases made by the "Card Organizations."   Here, the new fees that CardConnect imposed did not originate from the Card Organizations, but rather by CardConnect directly.

72.     Even if CardConnect had provided timely advance notice of the new fees, they would still be improper.   Indeed, good faith and fair dealing constrains CardConnect's ability to use its discretion to add fees which were not contemplated by the parties.   For example, although a contract may leave discretion to create a new fee, and thereby profit one party to the other party's detriment, good faith and fair dealing precludes such improper conduct.   Thus, even if its self-granted ability to mark up rates and create new fees is enforceable, Defendant is bound to exercise its contractual discretion in good faith.   CardConnect's manipulation of Plaintiffs' fees and charges was done for no other reason than to increase profits.   This does not comport with good faith and fair dealing.

73.     The improper fees referenced above are not the only unauthorized fees and charges which CardConnect has taken from Plaintiffs.   Plaintiffs are not in possession of all of their monthly statements and CardConnect – likely in violation of federal law – refused to provide these documents to Plaintiffs or their counsel.   Tech Lounge was even told that a subpoena would be required for it to obtain copies of its own monthly statements.   There is no doubt that the records (and CardConnect's internal data) will show that numerous other improper fees were assessed,

including unauthorized junk fees and misleading mark-ups of interchange charges and assessments, which should have been passed through at cost.

74.    CardConnect has also seized or kept additional funds from Plaintiffs' accounts based upon improper fees, charges, assessments, and practices.  Despite many written and verbal complaints from Plaintiffs and their representatives, Defendant has failed to provide a proper accounting of all funds which it has refused to properly credit to Plaintiffs' accounts.  The total extent of such amounts improperly retained by Defendant will not be known until discovery is undertaken.

75.    Plaintiffs' experiences with CardConnect are not isolated, but rather are illustrative of Defendant's improper business practices towards its customers.

## CLASS ACTION ALLEGATIONS

76.    Pursuant to Federal Rules of Civil Procedure 23(b)(2) and (3), Plaintiffs bring this class action on behalf of themselves and all those meeting the following class definition:

> All United States persons or entities charged unauthorized amounts
> for payment processing services by CardConnect.

Plaintiffs reserve the right to modify or amend the definition of the proposed Class, or add other proposed classes or subclasses, before the Court determines whether certification is appropriate and as the Court may otherwise allow.

77.    Excluded from the Class are Defendant, its parents, subsidiaries, affiliates, officers, and directors, any entity in which Defendant has a controlling interest, all customers who make a timely election to be excluded, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

78.    The time period for the Class is the number of years immediately preceding the date on which this Complaint is filed as allowed by the applicable statute of limitations, going forward into the future until such time as Defendant remedies the conduct complained of herein.

79.    The proposed Class meets all requirements for class certification.  The members of the Class are so numerous that joinder is impractical.  The Class consists of, at the very least, thousands of members and the identity of those persons and entities is within the knowledge of Defendant and can be ascertained by resort to CardConnect's records.

80.    The claims of the representative Plaintiffs are typical of the claims of the Class. Plaintiffs, like all other members, were victimized by CardConnect's improper practices. Moreover, Plaintiffs, like all members, have incurred monetary damages as a result of CardConnect's misconduct.  Furthermore, the factual basis of Defendant's misconduct is common to members of the Class, and represents a common thread of conduct resulting in injury to all members of the Class.

81.    There are numerous questions of law and fact common to the Class and those common questions predominate over any questions affecting only individual Class members.

82.    Among the questions of law and fact common to the Class are:

a.    Did CardConnect require merchants to enter the same or materially similar contracts during the Class Period;

b.    Whether CardConnect and Wells Fargo (or other bank as applicable) signed any customer contracts, thus accepting the terms as a condition precedent to the formation of a valid      contract;

c.    When did CardConnect begin assessing or increasing each improper charge;

d.    Which of these charges are improper or unauthorized;

e.    Did merchants receive any tangible benefit from the improperly assessed charges;

      f.     Was CardConnect unjustly enriched by its conduct;

      g.     If a contract exists, did such contract include unconscionable or otherwise unenforceable provisions, including but not limited to those purporting to limit Defendant's liability, require early termination fees, require payment of Defendant's attorney's fees, and allow Defendant to disregard the agreed upon fees and charges;

      h.     Did CardConnect breach contractual provisions in assessing improper charges; and

      i.     Did CardConnect breach the covenant of good faith and fair dealing.

83.    Other questions of law and fact common to the Class include:

      a.     The proper method or methods by which to measure damages; and

      b.     The declaratory or other equitable relief to which the Class may be entitled.

84.    Plaintiffs' claims are typical of the claims of other members of the Class in that they arise out of the same wrongful policies and practices and the same or substantially similar unenforceable provisions of the unexecuted contracts and related documents. Plaintiffs have suffered the harm alleged and have no interests antagonistic to the interests of any other member of the Class.

85.    Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions. Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Class.

86.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of CardConnect, most Class members could not afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class members will be unable to obtain redress for their losses and Defendant's misconduct will have occurred without remedy.

87.     Even if Class members themselves could afford such individual litigation, the court system could not.  Individualized litigation would significantly increase the delay and expense to all parties and to the Court.  Individualized litigation would also create the potential for inconsistent or contradictory rulings.  By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

88.     The prosecution of separate actions by individual Class members would create a risk of inconsistent and varying adjudications concerning the subject of this action, which adjudications could establish incompatible standards for Defendant.

89.     Defendant has refused to correct its conduct and such inaction is generally applicable to the Class, thereby making appropriate declaratory relief with respect to the Class as a whole.  Specifically, CardConnect continues to knowingly overbill the Class and to enforce unconscionable or otherwise unenforceable contractual provisions.  Class-wide declaratory relief is appropriate to put an end to these illicit practices.

## REQUESTS FOR RELIEF

### COUNT ONE
### DECLARATORY RELIEF –
### NO BINDING CONTRACT EXISTS

90.     Plaintiffs repeat paragraphs 1 through 89 above.

91.     Class-wide declaratory relief is appropriate where a Defendant has "acted or refused to act on grounds that apply generally to the class."

92.     Defendant has established a system through which it obtains merchant signatures on its form Applications but it does not itself sign (or have Wells Fargo or other bank as applicable

sign) the contract.  However, because the Application, Program Guide, and incorporated rules of the card associations require CardConnect and its member bank to both sign the Application before a contract can "take effect," no contractual relationship is ever actually formed between the parties. *E.g.*, *Franklin Interiors v. Wall of Fame Management Co.*, 511 A.2d 761, 762 (Pa. 1986) (if effectiveness of contract is "expressly conditioned upon the written approval" of a party and that party never signs, no enforceable contract exists).

93.    The Court should declare that there is no binding, enforceable contract between CardConnect, on the one hand, and Plaintiffs and the Class members, on the other hand.

94.    The Court should also declare that Plaintiffs and the Class members have not waived any rights to rely on the signature requirement.  Further, for Class members who still process transactions through CardConnect, the Court should declare that CardConnect and Wells Fargo (or other bank as applicable) cannot now sign such contracts in an effort to make them effective.

95.    Judicial declarations in this regard are necessary and appropriate so the parties may ascertain their rights, duties, and obligations with respect to one another.

## COUNT TWO
## UNJUST ENRICHMENT

96.    Plaintiffs repeat paragraphs 1 through 89 above.

97.    Plaintiffs assert a common law claim for unjust enrichment.  Given the parties do not have an enforceable contractual relationship, unjust enrichment will dictate that Defendant disgorge all improperly assessed fees for merchant services.

98.    As alleged herein, Plaintiffs and the Class members have conferred benefits on Defendant in the form of monies, and Defendant has appreciated such benefits.

99.     However, acceptance and retention of such benefits would be unjust under these circumstances.   Specifically, CardConnect and Plaintiffs and the Class members expressly negotiated the amount of fees CardConnect would charge for merchant services, yet CardConnect rountinely charged and seized more than such amounts.  CardConnect did so, not because its costs increased, but merely to enrich itself at the expense of Plaintiffs and the Class members.

100.    CardConnect seized such excessive amounts from the bank accounts of Plaintiffs and the Class members before it even provided them with billing statements itemizing the overcharges.

101.    CardConnect also refuses to allow Plaintiffs and the members of the Class to avoid such overcharges unless they pay large early termination fees, which typically exceed the amounts of the overcharges.

102.    It would be unjust, inequitable, and unconscionable under these circumstances for CardConnect to retain all amounts it has received from Plaintiffs and the Class that exceed the agreed-upon charges.

103.    Plaintiffs and the other Class members are entitled to seek and do seek restitution from Defendant as well as an order from this Court requiring disgorgement of all profits, benefits, and other compensation obtained by Defendant by virtue of its wrongful conduct.

**COUNT THREE**
**BREACH OF CONTRACT INCLUDING BREACH OF THE COVENANT**
**OF GOOD FAITH AND FAIR DEALING**

104.    Plaintiffs repeat paragraphs 1 through 89 above.

105.    This claim is brought in the alternative to Counts One and Two, *supra*.  In the event the contract is found to be binding, the actions taken by CardConnect have materially violated the specific terms of such contracts.  Further, Defendant has breached the contract by violating the

covenant of good faith and fair dealing. CardConnect is liable for the losses of Plaintiffs and the Class that have resulted from its breaches of contract.

106.     CardConnect violated the contract by assessing improper charges not provided for in the contract, to include improperly inflated charges, additional fees not even mentioned in the contract, charges for worthless services and charges which should have been waived, and by unilaterally marking up agreed-upon fees and charges without legal basis and without proper notice. Thus, CardConnect has materially breached the express terms of its own form contract.

107.     Plaintiffs and the Class have performed all, or substantially all, of the obligations imposed on them under the contracts, or those obligations have been waived by CardConnect.

108.     Plaintiffs and members of the Class sustained damages as a result of CardConnect's breaches of contract.

109.     Given the contract's stipulation that Pennsylvania law applies, the elements of breach of contract are identical for all members of the Class.

110.     Pennsylvania law also imposes upon each party to a contract the duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute violations of good faith and fair dealing in the performance of contracts.

111.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified. A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

112.    By charging fees that are inconsistent with those laid out in the contract, including but not limited to, increasing the amounts of agreed-upon fees and imposing new categories of fees not referenced in the contract, CardConnect has violated the spirit of the contract and breached the covenant of good faith and fair dealing.  Even if CardConnect believed that it had given itself contractual discretion to increase markups and fees, or add new fees, such discretion is constrained by good faith and fair dealing under Pennsylvania law and Defendant's actions do not comport with this duty.

113.    Plaintiffs and the Class have performed all, or substantially all, of the obligations imposed on them under the contract.  There is no excuse or defense for CardConnect's conduct under Pennsylvania law.

114.    Plaintiffs and members of the Class sustained damages as a result of CardConnect's direct breaches of the contract and Defendant's breaches of the covenant of good faith and fair dealing.  As such, all elements for a successful claim under Pennsylvania law have been satisfied.

## COUNT FOUR
## DECLARATORY RELIEF –
## INVALIDITY OF CERTAIN CONTRACT TERMS

115.    Plaintiffs repeat paragraphs 1 through 89 above.

116.    This Count is brought in the alternative to Counts One and Two, *supra*.  If the Court determines that no effective contract was formed pursuant to Count One, it will not need to address this Count.

117.    Class-wide declaratory relief is appropriate where a Defendant has "acted or refused to act on grounds that apply generally to the class."

118.    Defendant has increased agreed-upon fees and rates and attempted to immunize itself from liability for its practices by burying provisions in the adhesive contract that purport to

make it virtually impossible for merchants to obtain relief from Defendant's overbilling practices. These provisions include but are not limited to the following sections of the Program Guide: 19.4, 19.5, 19.10, 21.4, 21.5, 22.3, 24.2, 34.3, and 35.7.

119.   Such provisions should be deemed unenforceable on multiple grounds.

120.   For example, those provisions which give CardConnect unlimited discretion to make changes or amendments to the contract for any reason or no reason at all (*e.g.*, Program Guide, §§ 19.4, 19.5, 35.7) render the contract illusory and lacking in mutuality.

121.   Moreover, these provisions and all others which Defendant has imposed to exculpate itself from liability are procedurally and substantively unconscionable.

122.   Such provisions are procedurally unconscionable because Defendant is a publicly-traded company worth hundreds of millions of dollars and Plaintiffs and the Class members are small businesses and individual guarantors.  Plaintiffs and the Class members must accept debit and credit cards to make their businesses competitive in the marketplace and thus require merchant services.  They are thus at the mercy of companies such as Defendant that provide such services. Indeed, as Defendant has acknowledged in its motion to dismiss the *Kao* case, such one-sided exculpatory clauses are "common" and "standard" in the industry (*see Kao*, Dkt. No. 11, p. 22), thus proving that Plaintiffs and the Class members lack any meaningful way to avoid them.

123.   Moreover, these take-it-or-leave-it provisions are buried in the Program Guide which consists of small, non-descript font occupying ***44 single-spaced pages***.  The subject provisions are set forth in thick, densely-worded paragraphs and are not prominently distinguished in any manner from other contractual terms.  *Id.*  To say, the provisions at issue are inconspicuous and difficult to comprehend is an understatement.  Indeed, the manner in which the clauses were

formatted and presented to Plaintiffs and the Class members has the effect of garnering no attention.

124.    Moreover, the provisions are also substantively unconscionable because they are unreasonably favorable to CardConnect.  Indeed, because the provisions are included within the adhesive Program Guide, which by its own terms was not negotiable, substantive unconscionability is clear.

125.    Thus, a judicial declaration is necessary and appropriate so the parties may ascertain their rights, duties, and obligations with respect to these provisions.

126.    The Court should use its equitable powers to declare these provisions to be unenforceable and enjoin their enforcement.

**WHEREFORE**, Plaintiffs, on behalf of themselves and the proposed Class, demand a jury trial on all claims so triable and judgment:

1.    Certifying this case as a class action pursuant to Federal Rule 23;

2.    Awarding declaratory relief as requested herein;

3.    Awarding restitution of all improper fees and charges paid to Defendant by Plaintiffs and the Class as a result of the wrongs alleged herein in an amount to be determined at trial;

4.    Compelling disgorgement of the ill-gotten gains derived by Defendant from its misconduct;

5.    Awarding actual damages in an amount according to proof;

6.    Awarding compensatory, general, nominal, and punitive and exemplary damages, as allowed by law;

7.    Awarding pre-judgment interest at the maximum rate permitted by applicable law;

8.      Reimbursing all costs and disbursements accrued by Plaintiffs in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

9.      Awarding such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury to the fullest extent permitted by law.

**Respectfully submitted,**

**Dated:  September 7, 2017**

/s/ KJG2445

Richard M. Golomb, Esquire
Kenneth J. Grunfeld, Esquire
**GOLOMB & HONIK, P.C.**
1515 Market Street, Suite 1100
Philadelphia, PA 19102
Phone: (215) 985-9177
Fax:     (215) 985-4169
Email: rgolomb@golombhonik.com
         kgrunfeld@golombhonik.com

E. Adam Webb, Esquire
Matthew C. Klase, Esquire
(*Pro Hac Vice* to be filed)
**WEBB, KLASE & LEMOND, LLC**
1900 The Exchange, SE, Suite 480
Atlanta, Georgia 30339
Phone: (770) 444-0773
Fax:     (770) 217-9950
Email: Adam@WebbLLC.com
         Matt@WebbLLC.com

*Attorneys for Plaintiffs*

27